**Affirmed in part; Reversed and Remand in part and Opinion Filed December 14, 2022**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-22-00617-CV**

**IN THE INTEREST OF P.H., A CHILD**

**On Appeal from the 196th Judicial District Court**
**Hunt County, Texas**
**Trial Court Cause No. 89,795**

## MEMORANDUM OPINION

Before Justices Partida-Kipness, Pedersen, III, and Nowell
Opinion by Justice Pedersen, III

The Department of Family and Protective Services (the Department) removed P.H. from her parents' care twelve days after she was born. A jury concluded that the parental rights of both parents (Mother) and (Father) should be terminated. Father appeals, contending that the evidence at trial does not support the jury's findings (1) that he failed to comply with a court order establishing the actions necessary for him to obtain the return of P.H. and (2) that termination of his rights was in P.H.'s best interest. For the reasons discussed below, we reverse the trial

court's Order of Termination as to termination of Father's parental rights. We remand the case for further proceedings in accordance with this opinion.

## BACKGROUND

Before P.H. was born, Mother and Father moved to live and work on a farm in Greenville. They made the move to be close to David Nipper, who also lived on the farm with his family, and who had become an important part of their support system. Some years before, Nipper taught Father to work on cars and allowed Father, who had been homeless, to live in his shop. Over time, Nipper began to work for a slaughterhouse owned by his best friend; a relative of that friend owned the farm and allowed the parents to live there rent-free in return for work they did on the property. Mother fed and watered the animals; she helped raise baby goats. Father helped maintain the property, including working to renovate one of the houses that needed significant repair.

Father also worked for the slaughterhouse, learning to process goats in accordance with tenets of the Muslim faith. At the time of trial, he and Nipper were being paid by the slaughterhouse to deliver meat to stores in the Dallas area. Mother and Father helped Nipper bale hay and raise goats on the farm; the three shared the proceeds of those sales. Sometimes, Nipper and Father would work on cars together for extra income.

Both parents suffer from diminished intellectual ability. Father's disability is worse than Mother's. He has received a monthly Supplemental Security Income

(SSI) check for a learning disability since he was a child. Nipper became Father's payee for the disability payments and took care of paying Father's bills for him. Some months before trial, Nipper adopted Father.

The parents had one child together before P.H. was born. C.H. was almost two at the time of trial. The Department had been involved with the parents concerning C.H., requiring them to perform a number of services after his birth. Father remembers attending parenting classes at the time; he did not complete a counseling requirement. C.H. lives with his maternal grandmother, but the parents' rights to him were not terminated.

When P.H. was born, Mother and Father brought her home to Nipper's home. Twelve days later, the Department removed P.H. from the parents' care and placed her in a foster home, where she has remained.

The parents were assigned a service plan based upon the trial court's temporary orders, which set forth the list of specific services to be performed in order to have P.H. returned to them. For just over a year, the parents visited P.H. weekly, sometimes walking more than an hour to spend time with her. They attended parenting classes, but they did not always understand how to apply the skills they were taught to their interactions with P.H. Their caseworker praised their ability to show affection to the child, but she reported that they sometimes became frustrated when the child did not do what they wanted or expected her to do. The parents often

displayed poor personal hygiene, causing concern that they might have difficulty keeping P.H. and her surroundings clean and safe.

The Department ultimately sought termination of both parents' right to P.H. on the ground that they had failed to comply with the trial court's order. Following a six-day trial, the jury found that both parents had failed to comply with the court's order and that termination of their rights was in P.H.'s best interest. The trial court signed its Order of Termination, adopting the jury's findings and appointing the Department as P.H.'s permanent managing conservator.

Father appeals.

## DISCUSSION

A court may terminate a parent's right to his child if it finds by clear and convincing evidence both that (1) the parent committed a predicate act prohibited under Texas Family Code Section 161.001(b)(1), and (2) termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(b)(1), (2); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012). Our supreme court has recently summarized and restated the principles guiding an appeal involving termination of parental rights, acknowledging that a parent's fundamental right to the care, custody, and control of his child is of constitutional magnitude. *In re J.W.*, 645 S.W.3d 726, 740 (Tex. 2022). Accordingly, before the State may terminate that right, the State must prove the two statutory elements of its case—a predicate act and best interest of the child—by clear and convincing evidence at trial. *Id.*

In this case, the Department proceeded to trial on only one predicate act. That single act was subsection (O), which asserts that the parent:

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

FAM. § 161.001(b)(1)(O).

The primary questions in this appeal, therefore, are whether the Department proved by clear and convincing evidence that Father failed to comply with his court-ordered services and whether termination of his parental rights was in P.H.'s best interest. The heightened burden of proof identified by the Texas Supreme Court affects our standard of review in a sufficiency challenge. *In re J.W.*, 645 S.W.3d at 741. Accordingly, when we review a legal sufficiency challenge, we must determine whether "a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We must review all the evidence in the light most favorable to the finding, assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* We may not disregard undisputed facts that do not support the finding. *Id.* And, as in any appellate review, we view the factfinder as the sole arbiter of the witnesses' credibility and demeanor. *Id.*

**The Threshold Requirement of Removal for Abuse or Neglect**

Initially, we address subsection (O)'s language requiring that the child has been in the managing conservatorship of the Department "as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child." FAM. § 161.001(b)(1)(O). Most of the predicate acts listed in section 161.001(b)(1) address conduct that occurs *before* a child is removed from her parents, for example placing the child in dangerous conditions, or with dangerous persons, or abandoning her. *See* FAM. § 161.001(b)(1)(D), (E), (G). By bringing this case under subsection (O), the Department focuses upon the parents' conduct *after* removal. However, this subsection (O) element—requiring that removal be for abuse or neglect of the child—assures that evidence proves the actual removal was rooted in proper grounds.

Appellant argues that the Department did not meet its burden to prove this threshold element, because no evidence was presented at trial that Father ever abused or neglected his daughter.

The Texas Supreme Court has confirmed that subsection (O) requires proof of abuse or neglect. *In re E.C.R.*, 402 S.W.3d 239, 246 (Tex. 2013). That proof can include evidence of a risk of abuse or neglect because, the court reasoned, the standard used by chapter 262 is "danger to the physical health or safety of the child." *Id.* at 247. The Department's proof can include "harm suffered or the danger faced by other children under the parent's care." *Id.* at 248. Overall, "[i]f a parent has neglected, sexually abused, or otherwise endangered her child's physical health or safety, such that initial and continued removal are appropriate, the child has been 'remov[ed] from the parent under Chapter 262 for the abuse or neglect of the child.'" *Id.*

### *Reasons for the Child's Removal*

Our review of the record confirms that the Department never directly addressed in its proof the reason or reasons that P.H. was removed from her parents. The Department offered no evidence at trial concerning its investigation that led to the child's removal. Caseworker Tanner Berogan testified that she was assigned to the case right after removal and that her first activity on the case involved attending the "removal staffing," That conference included Berogan and her supervisor, as well as the investigation worker and her supervisor. And at that conference, Berogan explained, the investigators "will enlighten us to the details as to why the child is being removed . . . . [and] we will determine, based upon the reasons that the child is being removed, what services we think that the parents would benefit from." But

–7–

Berogan, who was the Department's representative at trial, did not tell the jury the reason P.H. was removed from her parents either at this point or later in her testimony.

At closing, counsel for Mother specifically reminded the jury that it had heard nothing about abuse of the child or ignoring the child. In response, the ad litem counsel for P.H. declared that "[P.H.] came in underweight" because "[the parents] didn't feed the child enough. And if that doesn't constitute abuse, then, my God, I don't know what does." This is the single allegation of abuse we identify in the trial record concerning treatment of P.H. before removal, and we identify no allegation of neglect.[1]

### The Feeding Allegations: No Clear and Convincing Evidence

In this Court, Father challenges the attorney ad litem's charge concerning the parents' feeding of P.H. He identifies only two references in testimony concerning the child's being underweight when she came into care. First, the caseworker referred to making some extra visits to the foster parents' home initially to be sure the baby was "reaching milestones" because she had been underweight. Then on cross, the attorney ad litem asked Berogan to explain what she meant by "underweight," and the caseworker responded: "Her BMI, I believe, was in the 5th

---

[1] We stress that this is not a merely semantic conclusion—abuse and neglect by any other name would go to prove the Department's case. But this is the only charge of mistreatment of P.H. before she was removed from these parents.

percentile. It had—she had lost a significant amount of weight from the time of birth to the time of removal." After establishing that the child did not have "a tapeworm or something that kept her from putting on weight," the ad litem asked: "So would this go to failure of the parents or the people caring for her to know when and how much to feed her?" Berogan responded "Yes."[2]

Appellant asserts correctly that no evidence was presented by a medical provider that abuse or neglect led to P.H.'s being underweight. Nor were there photographs or specialists' testimony that purported to show abuse or neglect. Rather, Mother testified that she attempted to breastfeed P.H. for two days—the length of her hospital stay—but when that was unsuccessful, she turned to the formula the hospital sent home with her for P.H. Mother testified that P.H. would spit up after drinking the formula and that she had made an appointment with the pediatrician for the following Monday, but the Department removed P.H. the Wednesday before that scheduled appointment. None of Mother's testimony was controverted.

---

[2] We have identified two other places in the trial record when P.H.'s weight was addressed, although neither ultimately provided evidence of mistreatment before removal. The baby's Court Appointed Special Advocate (the CASA) agreed—again with a question from the attorney ad litem—that the baby was underweight and that she "was not being fed properly" before removal. But the CASA conceded when questioned by counsel for Father that she was not involved in the investigation and that she did not know why the baby was underweight.

The final reference was made by the attorney ad litem in her closing argument to the jury, when she accused the parents of "starving their kid."

The Department's brief in this Court embraces the characterization of P.H.'s feeding concerns as evidence of pre-removal abuse. It states:

> P.H. was removed in March 2021 when the child was discovered underweight at the 5th percentile body mass index and had "lost a significant amount of weight" after birth in [Mother's] and [Father's] care. Caseworker Berogan related that the child's weight loss was from the parents' failure to understand when or how much to feed the child— and the child immediately put on weight in her foster home. . . . Despite that the newborn baby was underweight and they could not feed the baby, they waited two weeks to make a doctor's appointment. Foster mother S.B. testified that the 12 day old P.H. came into her care "tiny, underweight" and hungry. She related that the child was immediately fed and was comfortable. She reported that they took the child to the pediatrician who immediately instructed them to feed her every two hours around the clock for 48 hours, even if it meant waking her. The jury had sufficient evidence establishing under (O) that the child was removed from F.H. "under Chapter 262 for the abuse or neglect of the child." (Record references removed.)

This response fails to overcome our concern for the lack of clear and convincing evidence of abuse or neglect, or of even a risk of abuse or neglect. The trial record establishes the following:

- Although Berogan agreed when asked that the child's being underweight went "to failure of the parents or the people caring for her to know when and how much to feed her," she did not testify to when or how much the parents fed P.H., that the time or amount was different from what the hospital instructed, or that she—or any other observer— corrected the parents' feeding practice.

- The brief's assertion that "[d]espite that the newborn baby was underweight and they could not feed the baby, they waited two weeks to make a doctor's appointment," is contrary to the evidence. The child was removed by the Department twelve days after she was born. For two of those days, Mother and child were directly under the hospital's care. And sometime before the morning of the twelfth day, Mother had already made another appointment with the pediatrician.

–10–

- The foster mother's appointment with a pediatrician occurred on the same Monday that Mother's appointment had been scheduled. A reasonable juror could infer from the record that the foster mother followed the hospital's instructions concerning feeding the child until she was instructed by the pediatrician to follow a different schedule. That juror could likewise infer that Mother's pediatrician would have similarly changed instructions for feeding P.H. on the same day.

We conclude that the Department did not present clear and convincing evidence that the parents' feeding of their child during the twelve days she was in their care was indicative of abuse, neglect, or a risk of either.

### *The Feeding Allegations: Not the Reason for Removal*

The Department begins its response on this issue with a quote from the trial court's temporary orders that includes findings of "danger to the physical health or safety of the child" and an "urgent need for [her] protection," based on "the Department's pleading, and the sworn affidavit accompanying the petition." A redacted form of the temporary order was admitted as evidence at trial, but the affidavit on which removal was based was not. The affidavit is included in our clerk's record. Although the jury did not see the affidavit, the Department's reliance here on the trial court's initial findings supports our reference to the affidavit where it contradicts the Department's position in this Court.

The affidavit was made by the Child Protective Services Investigator in this case. We identify here only her testimony establishing the information the Department possessed at the time of removal concerning the child's weight and any feeding issue.

- The Department received a referral concerning P.H. on March 12, 2021, the day she was born, that stated: "Mother has a history of removal with sibling, C.H. Mother's cognitive ability may be the reason why mother has a history of removal with sibling but it's unclear. It's unknown of the exact reasoning behind mother's history of removal. There are no concerns of drug use with mother." The referral made no reference to Father.

- On March 12, the investigator called the hospital and spoke to the charge nurse who said "the baby, [P.H.], is doing well and the mother is doing well. She reports the mother and father were appropriate with the baby and changing the baby and ensuring that she was swaddled right. They appear to be bonding well. She states they are not very educated; however, they are smarter than they are given credit for. The baby was born full [term]and is a bottle-fed baby. She indicated at this time she did not have any concerns, and there were no drug concerns with this family."

- On March 15, the investigator met with Mother at Nipper's home, and Mother told her that P.H. was born weighing 7 lbs. 2 oz. and was 19 inches long. She identified the baby's pediatrician and told the investigator that P.H. "has been eating about every three hours and has been eating 32 ml." Mother "was able to state that formula bottles are comprised of one scoop for two ounces of water."

- On March 17, the investigator confirmed that Mother had taken P.H. to her first pediatrician appointment after discharge. Mother informed the investigator that "there was one issue due to the baby not gaining weight," and a follow up appointment was scheduled. Paperwork from the appointment identified the following numbers giving P.H.'s status:

  BMI: 11.59 (5th percentile)

  Height: 1 '8" - 20 inches (74th percentile)

  Temperature: 98.3 degrees (F)

  Oxygen Saturation: 97%

  Weight: 6 lbs. 9.5 oz (23rd percentile)

- March 24, after taking the parents for a drug test, the investigator took parents and P.H. to have her "weighed professionally." P.H. weighed 7

–12–

pounds, 4 ounces. The investigator did not report any concerns from the doctor who weighed her.

- The affidavit contains no further reference to P.H.'s weight or any feeding issue. Those matters are not identified as concerns in the Department's conclusions.

P.H. weighed more when she was removed from the parents than she had at birth. It is apparent—from the affidavit presented to the trial court—that actors for the Department *knew* that P.H. had not "lost a significant amount of weight from the time of birth to the time of removal" from her parents' care. It is not surprising, therefore, that the Department did not urge the trial court to grant it conservatorship of P.H. for any reason related to her weight or her parents' feeding practices.

### *Prior Department Case: No Clear and Convincing Evidence*

The Department's brief also offers this statement concerning Father's prior experience with CPS in his son's case:

> It is undisputed that [Father] had recently lost custody of another child C.H. through another CPS case in which he had failed to complete his services. Ms. Hines-Ligon, who completed a psychosocial assessment of [Father] during C.H.'s case, testified that he had illogical reasoning and below average intelligence and recommended he complete therapy—which he did not do. (Record references removed.)

Father did testify that he had been involved with CPS concerning his and Mother's older child, C.H. He testified that they were required to work services and that they attended parenting classes. He underwent a psychosocial assessment that recommended individual counseling, and he admitted that he did not complete that requirement. However, his parental rights were not terminated in that case.

–13–

The Department did not offer any evidence—let alone clear and convincing evidence—that Father's relationship with C.H. included abuse or neglect or a risk of either. Indeed the removal affidavit discussed above—which we cite again to show what the Department knew at that time of removal—includes the disposition of the prior case, which states:

> It is unable to be determined that [Mother] or [Father] neglectfully supervised [C.H.]. There is not enough evidence to determine whether or not the injuries/circumstances sustained meet the definitions of abuse/neglect as outlined in the Texas Family Code due to the family appears to have all utilities working at their current residence and have shown that they are providing the child with all of his basic needs.

The supreme court has allowed evidence of "harm suffered" or "danger faced" by other children in the parent's care to suffice to support the element of "removal for abuse or neglect" in the case of the child at issue. *In re E.C.R.*, 402 at 248. But the trial record in this case is devoid of such evidence.

We acknowledge that the record in P.H.'s case, and the affidavit's summary of the prior case, contain consistent references to Father's diminished mental capacity. But the Department did not attempt to prove that Father's deficiency rendered him unable to provide for the physical, emotional, and mental needs of P.H. as the predicate act for termination of his rights. *See* FAM. § 161.003. It chose instead to limit its proof to subsection (O) and was thereby required to bring clear and convincing evidence that P.H. was removed from Father's care for reasons of abuse or neglect. We conclude that a reasonable fact finder could not have formed a firm

–14–

conviction that the Department removed P.H. for abuse or neglect. *In re J.W.*, 645 S.W.3d at 741.

This ground alone supports reversal of the trial court's order terminating Father's parental rights. *See In re E.N.C.*, 384 S.W.3d at 803 (State must prove parent committed act prohibited under Texas Family Code section 161.001(1)); *see also Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) ("termination of a parent-child relationship may not be based solely upon what the trial court determines to be the best interest of the child").

### Father's Compliance with the Court Order

Our resolution of this appeal will reinstate Father's temporary conservatorship of P.H. Given that outcome, and in the interest of judicial efficiency, we address the remainder of Father's first issue, which argues that the Department did not prove by clear and convincing evidence that Father failed to comply with the court's order detailing the services he was required to complete to effect the return of P.H.

Undisputed evidence supports the conclusion that Father did comply with the following required services:  he complied with all requested drug tests, and all test results were negative; he committed no criminal conduct; he spent no unsupervised time with children under 18; he attended the required newborn parenting class and the Father's Focus class; he underwent a psychiatric assessment and a psychosocial assessment; he maintained communication with the caseworker; and he attended all visits with the child unless he or the child had been ill.

The Department identifies four areas in which it asserts Father failed to comply with the court's order; we address them in turn.

### *Obtaining Stable Housing*

Immediately after P.H.'s birth, Mother and Father lived with her in David Nipper's home. Nipper lived in that house with his girlfriend and their two young children. The Department offered no evidence that this home presented any concern for P.H.'s safety or welfare.[3] However, after P.H. was removed, the trial court's order did not allow the parents to live in a home with or to supervise a child under 18 years of age.

To comply with the order, the parents first moved into a second home on the farm property, which required significant structural and cosmetic repair. The trial court admitted photographs of the home; it was undisputed that the home was cluttered and dirty and not in a safe and sanitary condition for a baby. However the parents testified that they did not intend to bring P.H. to live in that house until they had successfully fixed it up. They planned to return to Nipper's house, and Nipper testified that he intended them to do so. Some two months before trial, the parents moved from the house under construction into a recreational vehicle on the same farm property. The Department did not offer any evidence of unsafe or unsanitary

---

[3] Indeed, the investigator reported in her removal affidavit that on successive visits to the Nipper home, it was "free of clutter and hazards."

conditions in the recreational vehicle. The parents and Nipper continued to work on the other house on weekends.

We conclude the Department did not offer clear and convincing evidence that the parents failed to obtain appropriate, stable housing for P.H.[4]

### *Obtaining a Stable Income*

The court's order required Father to obtain a stable income. Rather than taking issue with each of the Department's allegations in this regard, we state simply that our review of the record does not comport with them. The evidence at trial shows Father has received a monthly SSI check based on a learning disability since he was a child; at the time of trial, that check was $783. He received food stamps. He testified he was receiving approximately $300 weekly for delivering meat for the slaughterhouse along with Nipper. And Nipper confirmed that Father and Mother received a portion of the price he received when he sold hay and goats. When Nipper and Father worked on cars, they split the money received. The parents lived rent-free on the property in return for the routine work they did on the farm, including feeding and watering animals and repairing the home they hoped eventually to live

---

[4] We necessarily reject, therefore, the Department's position that the parents should be penalized in this regard for refusing to move to a shelter called the Samaritan's House. The evidence was undisputed that this option was temporary and that the parents would be separated within its facility. The parents' plan for P.H. on the property where they lived—Nipper's home until the second home could be appropriately repaired—was not an unreasonable alternative to that option. Our record includes no other evidence of housing options suggested by the Department to the parents.

in.[5] Both Father and Nipper testified that occasionally, Nipper helped the parents with food expenses.

Our review of the record makes clear that the Department preferred that the parents find work away from the farm where they lived. It complains that the parents did not accept the opportunity to seek jobs through the Texas Workforce Commission. And there was evidence that Father could have earned more without losing his disability payment. But the parents preferred their work on the farm. The Department did not offer any evidence of something the parents needed, but could not afford, because of their choice to maintain their simple lifestyle.

We conclude the Department failed to prove by clear and convincing evidence that Father did not achieve a stable income for his family.

### Treatment for Mental Health Condition

Appellant contends that Father failed to comply with the court's order because "he stopped taking his psychotropic medications as recommended by his psychiatric evaluation." The court's order required Father to "complete a psychiatric evaluation and follow any recommendations of the evaluation; including but not limited to any prescribed medications." The evidence established that Father completed the evaluation with Carol Starr, who testified that it was "difficult to diagnose" Father's mental health because he did not appear to understand her questions and he

---

[5] Testimony established that the owner of the property provided the construction materials necessary for renovation of the house.

communicated poorly. She admitted that she had "little experience" working with people who have an intellectual deficit. She testified that she "believe[s] he probably has type II bipolar disorder." This tentative diagnosis was based on Father's reporting that "his mood was often on," that his sleep was very poor, and that anger was a problem for him three to four times a week. Starr prescribed Father a mood stabilizer and a medication to take for insomnia as needed. She subsequently prescribed him an anti-depressant. She continues to treat him.

As the Department asserts, Father testified—and told both Starr and Berogan—that in December 2021, he stopped taking the mood stabilizer. Starr testified that Father did not have any of the delusions or bizarre behavior typical of a higher level of bipolar disorder. She acknowledged that the mood stabilizer had more side effects than the anti-depressant and that Father told her he thought the medicine made him "mean to [his] girlfriend." Starr did not prescribe the medicine again. In fact she volunteered on cross-examination that "the med that he did stop in December, there are not big problems for stopping."

We understand the Department's concern that Father's mental health issues not go untreated. However, he continues to be treated by Starr. While she would prefer he take the mood stabilizer, it is no longer a "prescribed medication" for Father. His mental health concerns are being treated.

We conclude the Department did not establish by clear and convincing evidence that Father did not complete this portion of his service plan.

### *Individual Counseling*

Finally, the Department contends that Father failed to comply with the court's order and his service plan because he did not attend independent counseling. Father acknowledged that he did not complete counseling. We do not question the beneficial nature of this requirement. Our review of the record suggests that many of the personal issues of which the Department complains—for example, Father's lack of personal hygiene, lack of knowledge of developmental needs of a baby, poor ability to plan, and frequent arguing with Mother—would be well addressed by a professional's providing appropriate counseling for Father.

Unfortunately, our review of the record establishes that the Department did not assist Father in finding such a counselor. He was sent first to Deborah Davis. She testified that Father met with her and told her he was willing to work on his issues. He specifically told her that he and Mother "argue a lot" and that he wanted to work on that. However, after seeing the parents in September 2021, Davis emailed Berogan in October and "suggest[ed] that she find someone who specializes in clients who have deficits as [the parents] have or challenges . . . that they have." Davis testified that in order to help Mother and Father, a counselor would have to have had experience working with people who have cognitive challenges. She did not have that experience, and she was not able to identify someone who did.

Berogan testified that in December, "close to Christmas," she learned about a program through Lakes Regional that addressed Intellectual Developmental

Disorder (IDD) that she thought would be a good fit for the parents, although she admitted that she did not know a lot about that program. Late in December, she told the parents she would like them to do the IDD intake for the program. In January, Berogan made contact with the program's intake specialists and gave them the parents' contact information; she did not give them any background information about the parents or about the Department's concerns. She does not know if the intake specialists ever contacted the parents, and Father was never asked if he was contacted by the IDD program at Lakes Resort.[6] But Berogan testified that the IDD program was *not* a court-ordered service. So even if the parents were contacted by the program, and even if they refused to do the intake after being contacted, the Department would not be closer to proving that Father had failed to comply with the trial court's orders.

The jury was instructed that:

A court may not order termination under Subsection (b)(1)(O) based on the failure by the parent to comply with a specific provision of a court order if a parent proves by preponderance of the evidence that:

(1) the parent was unable to comply with specific provisions of the court order; and

(2) the parent made a good faith effort to comply with that order and the failure to comply with the order is not attributable to any fault of the parent.

---

[6] We note in this regard that Carol Starr, who assessed and treats Father for his diagnosed mental illness, works out of Lakes Resort. She explained that the IDD facility is separate from hers and she has almost no contact with it. But she testified that she knew the doctor who provided psychiatric treatment for the IDD program had retired, and she knew that he had not been replaced at the time of trial.

–21–

See FAM. § 161.001(d). Father met with Davis through the month of September and expressed his willingness to work with her. But the Department's failure to identify an appropriate replacement for Davis rendered Father unable to comply with that provision of the court's order. The evidence supports our conclusion that Father made a good faith effort with Davis, but that the failure to comply with the requirement of individual counseling was not attributable to Father's fault. Accordingly, the court could not order termination of Father's rights under subsection (O) based on his failure to complete individual counseling. *See id.*

We conclude that the Department failed to carry its burden under subsection (O) to prove by clear and convincing evidence that Father failed to comply with the court's order establishing the actions necessary for him to obtain the return of P.H. A reasonable fact finder could not have formed a firm conviction that Father failed to comply with that order as long as compliance was possible for him. *See In re J.W.*, 645 S.W.3d at 741.

This second failure by the Department also supports reversing the trial court's order terminating Father's parental rights. *See In re E.N.C.*, 384 S.W.3d at 803; *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

We sustain Father's first issue.[7]

---

[7] Because we have sustained Father's first issue on both grounds argued, we do not address his second issue, which argues that the trial court did not establish by clear and convincing evidence that termination of his rights was in the best interest of P.H.

### *Conservatorship of P.H.*

The trial court's Order of Termination appointed the Department as Permanent Managing Conservator of P.H. The appointment was not made solely because of termination of Father's (or Mother's) parental rights. Instead, the trial court made this additional finding:

> The Court finds that the appointment of the Respondents as permanent managing conservator of the child is not in the child's best interest because the appointment would significantly impair [the] child's physical health or emotional development.

*See* FAM. § 153.131(a). According to the Texas Supreme Court, our reversal of the termination order in these circumstances "does not affect the trial court's conservatorship appointment absent assigned error." *In re J.A.J.*, 243 S.W.3d 611, 613 (Tex. 2007). Father did not separately challenge the appointment of the Department, so we cannot reverse the appointment of the Department as P.H.'s managing conservator.

However, as the court pointed out in *In re J.A.J.*, the trial court retains jurisdiction to modify a conservatorship order if it is in the child's best interest and the parent's or child's circumstances have materially and substantially changed since the order was rendered. *Id.* at 617 (citing FAM. §§ 156.001, 156.101). In addition, Father retains standing to file a suit to modify a conservatorship order. *See id.* (citing FAM. §§ 156.001, 102.003(a)(1)). And when the Department has been named a child's managing conservator, the court is directed to conduct regular hearings to review that appointment every six months until the child becomes an adult. *Id.*

(citing FAM. §§ 263.002, 263.501). According to the supreme court, these hearings "guarantee that courts will continuously review the propriety of the Department's conservatorship, until a point when the child's family appears capable of providing for the child's best interests." *Id.* (citing FAM. §§ 263.002, 263.501).

The trial court's finding discussed above relates to appointment of Father as managing conservator. On remand, the trial court is directed to reinstate Father's status as possessory conservator of P.H. *See* FAM. § 153.191.

### CONCLUSION

We reverse the trial court's Order of Termination as to termination of Father's parental rights. We remand this case for further proceedings in accordance with this opinion.

/Bill Pedersen, III//

BILL PEDERSEN, III

220617f.p05                                        JUSTICE

–24–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF P.H., A CHILD

No. 05-22-00617-CV

On Appeal from the 196th Judicial District Court, Hunt County, Texas
Trial Court Cause No. 89,795.
Opinion delivered by Justice Pedersen, III. Justices Partida-Kipness and Nowell participating.

In accordance with this Court's opinion of this date, the trial court's Order of Termination is **AFFIRMED** in part and **REVERSED** in part. We **REVERSE** that portion of the trial court's Order of Termination that terminated the parental rights of Francis Patrick Hines to his child Patricia Hines. In all other respects, the trial court's judgment is **AFFIRMED**. We **REMAND** this cause to the trial court for further proceedings consistent with this opinion.

It is **ORDERED** that appellant Francis Patrick Hines recover his costs of this appeal from appellee Department of Family & Protective Services.

Judgment entered this 14th day of December 2022.